**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**ANDREW WOLSKI and DEBORAH WOLSKI,**

      **Plaintiffs,**

v.                                                         **Case No: 6:13-cv-1623-Orl-31TBS**

**ORANGE COUNTY SCHOOL BOARD, ATHENA ADAMS, CHRISTOPHER SMART, MURRAY SAWYER, REGINALD FORBES, SHIRLEY COWANS and D. NORVELLE ROLAND,**

      **Defendants.**

## ORDER

This matter is before the Court on the Defendants' motions to dismiss the Amended Complaint and the Plaintiffs' responses thereto.[1]

**I. Background**

This case arose out of disciplinary proceedings against the Plaintiffs' son, J.W., that were initiated due to an incident he was involved in at Bridgewater Middle School in Orange County,

---

[1] The motions and respective responses are: Orange County School Board's Motion to Dismiss (Doc. 36) and Plaintiffs' Response to Orange County School Board's Motion (Doc. 54); Athena Adams' Motion to Dismiss (Doc. 52) and Plaintiffs' Response to Adams (Doc. 74); Murray Sawyer's Motion to Dismiss (Doc. 55) and the Plaintiffs' Response to Sawyer (Doc. 75); Christopher Smart's Motion to Dismiss (Doc. 56) and the Plaintiffs' Response to Smart (Doc. 76); Norvelle Roland's Motion to Dismiss (Doc. 57) and the Plaintiffs' Response to Roland (Doc. 77); Shirley Cowans' Motion to Dismiss (Doc. 67) and the Plaintiffs' Response to Cowans (Doc. 79); and Reginald Ford's Motion to Dismiss (Doc. 80) and the Plaintiffs' Response to Ford (Doc. 92). The motions to dismiss by the individual parties rely on the same law and present the same substantive arguments for the applicable counts against each individual—motions like these are commonly referred to as "me too motions"—accordingly, the Court will analyze the legal matters for those motions cumulatively and address any distinguishing allegations as necessary.

Florida. According to the Amended Complaint, on Friday, February 17, 2012, J.W. innocently brushed the shoulder of a female student, M.R., to get her attention while they were alone in an office inside the school's band room. The contact, however, startled M.R. who fell onto J.W.'s arm—in the process of standing up, J.W. attempted to remove his arm from under M.R. and she bit him. Both children quickly stood up and J.W. apologized for startling M.R., they hugged, and then both left the room in a non-urgent manner. Because the contact occurred in a private area of the band room there were no other witnesses to the events. The Plaintiffs allege that M.R. waited through several classes and then falsely reported to school administrators that J.W. had inappropriately touched her by fondling her breasts and buttocks. The crux of this case is how the school responded to that report.

M.R. reported the events to a guidance counselor who instructed M.R. to write down her account of the contact.[2] Neither J.W. nor his parents were informed of the allegations until the following Tuesday, February 21, 2012 at which point J.W. was called into the school's discipline office to be questioned by three school officials, Murray Sawyer, the Assistant Principal; Christopher Smart, the Eighth Grade Dean; and Corporal C. Campbell, an Orange County Deputy Sheriff who was serving as the School Resource Officer. After approximately one hour of questioning, J.W. was allegedly directed to write a statement about the incident and Sawyer directed him to change his statement to utilize incriminating terminology that was specified by Sawyer. J.W. was then questioned by Athena Adams, the school's Principal, who had him rewrite his statement and instructed that he use additional incriminating terminology. During at least part of this time J.W.'s mother was at the school but was not permitted to be present during the questioning.

---

[2] M.R. had also discussed the events with three other students who were instructed by the guidance counselor to write down their accounts of M.R.'s allegations. These hearsay accounts were allegedly considered in the subsequent disciplinary proceedings.

Ultimately, Principal Adams brought J.W. into a conference room to meet his parents along with Sawyer and Corporal Campbell. In the conference room Adams explained that J.W. was being suspended based on M.R.'s allegations and she was recommending his expulsion—however school procedure required an expulsion hearing which would occur in the following days. Prior to the expulsion hearing, Adams and the Plaintiffs had a follow-up meeting on February 27, 2012, at which time Adams expressed that she had not seen an alleged infraction of this type excused and expunged from a student's record.

Following J.W.'s suspension on February 21, 2012, two expulsion hearings were held for J.W. The first occurred on March 1, 2012 and was conducted by Defendant Reginald Forbes, an Area Administrator for the Orange County School Board ("OCSB"). At the hearing Forbes asked J.W. to answer questions about the contact between him and M.R. Mr. Wolski, J.W.'s father, who was in attendance, stated that J.W. had already answered the school's questions and asserted that his son's rights had been violated. Dean Smart read the school's version of events including statements by J.W. that Plaintiffs assert he never made. Smart then recommended J.W.'s expulsion. The Wolskis repeatedly requested the right to question M.R. and the other students she had spoken to about the incident, but their requests were denied. While Forbes held that two of the school's charges against J.W. were not supported, he ruled that J.W. was to be expelled due to the alleged inappropriate contact with M.R.

The Wolskis requested reconsideration of the decision and a new hearing was scheduled for March 13, 2012.[3] The second hearing was held before Defendant D. Norvelle Roland who also requested that J.W. answer questions at the hearing. At the second hearing the Wolskis again

---

[3] There was delayed notification about the initial date of the second hearing, which was scheduled for March 6, 2012 but the Wolskis did not receive notice until March 7. However, the hearing was rescheduled following the delayed notice, and the Wolskis were able to attend.

requested the opportunity to question M.R. on her account, but the request was denied. Roland heard the accounts, without additional input from J.W. and without the Wolskis being permitted to question M.R., and stated that the he would subsequently issue a determination.

Following the hearings with Forbes and Roland, the Wolskis received a ruling from Forbes, the first hearing officer, stating that J.W.'s charges had been reduced to a "Level IV 4T (Other)"[4] but Forbes was still recommending J.W.'s expulsion. The Wolskis contacted the OCSB's administrative office to appeal the decision. On April 6, 2012 the Wolskis met with Forbes and Shirley Cowans, Area Superintendent for the OCSB to discuss J.W.'s discipline, who stated that they would go to the school and talk to some individuals and look into the matter further. On April 9, 2012, prior to the appeal hearing, and following the investigation by Forbes and Cowans, the Wolskis were contacted by phone and informed that J.W.'s charges were reduced to a "Level III 3Q (Other Serious Misconduct)," his expulsion would be rescinded, and he was instructed to return to school on the following day. However, J.W.'s record still contains the lesser, Level III violation and the procedures resulted in a suspension lasting 28 days.

The Plaintiffs assert that the way the Defendants conducted themselves demonstrated a de facto policy of upholding accusations while ignoring exculpatory information and without conducting a complete investigation. Accordingly, they allege that the Defendants have violated their son's procedural due process rights[5] and seek relief pursuant to 42 U.S.C. § 1983, Plaintiffs

---

[4] Definitions of the various levels of infractions are contained in the Amended Complaint. For the purposes of this Order, it is enough to know that J.W.'s alleged violation levels were progressively reduced.

[5] While the Amended Complaint includes the statement that J.W.'s substantive due process rights have been violated, subsequent pleadings make clear that the Plaintiffs are asserting only a violation of J.W.'s procedural due process rights. (Doc. 54 at 7-8).

further allege that some of the Defendants have intentionally inflicted emotional distress upon their son.

## II. Standard

### a. Motion to Dismiss

In ruling on a motion to dismiss, the Court must view the complaint in the light most favorable to the Plaintiff, *see, e.g.*, *Jackson v. Okaloosa County, Fla.*, 21 F.3d 1531, 1534 (11th Cir. 1994), and must limit its consideration to the pleadings and any exhibits attached thereto.  Fed. R. Civ. P. 10(c); *see also GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993).  The Court will liberally construe the complaint's allegations in the Plaintiff's favor.  *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969).  However, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal."  *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In reviewing a complaint on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "courts must be mindful that the Federal Rules require only that the complaint contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " *U.S. v. Baxter Intern., Inc.*, 345 F.3d 866, 880 (11th Cir. 2003) (citing Fed. R. Civ. P. 8(a)).  This is a liberal pleading requirement, one that does not require a plaintiff to plead with particularity every element of a cause of action.  *Roe v. Aware Woman Ctr.for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001). However, a plaintiff's obligation to provide the grounds for his or her entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-555 (2007).  The complaint's factual allegations "must be enough to raise a right to relief above the speculative level," *Id.* at 555, and cross "the line from conceivable to plausible."  *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009).

### III. Analysis

#### a. Alleged Violations of J.W.'s Civil Rights

##### i. Notice and Opportunities to Respond

The Plaintiffs allege that OCSB had a policy of not believing an accused student's version of events and withholding exculpatory information without conducting a complete investigation. Thus, Plaintiffs claim that J.W.'s treatment during his questioning and hearings lacks fundamental fairness. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) (municipal liability is predicated on a policy or practice in violation of an individuals' civil rights). Procedural due process "requires that the state provide fair procedures and an impartial decision maker before infringing on a person's interest in life, liberty, or property." *McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir.1994). It is not the deprivation of a protected interest that causes a violation, but rather, "[i]t is the state's failure to provide adequate procedures to remedy the otherwise procedurally flawed deprivation of a protected interest that gives rise to a federal procedural due process claim. *Cotton v. Jackson*, 216 F.3d 1328, 1331 (11th Cir.2000); *see also McKinney*, 20 F.3d at 1557 (it is "only when the state refuses to provide a process sufficient to remedy the procedural deprivation [that] a constitutional violation actionable under section 1983 arise[s].").

The Plaintiffs principally rely on *Goss v. Lopez*, 419 U.S. 565 (1975), for the proposition that school discipline that results in suspension of several days or more is the type of activity that requires notice and a hearing with more procedural safeguards than were utilized in J.W.'s case. Previously, in addressing this standard, the Middle District of Florida has stated:

> The United States Supreme Court held in *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), that due process applies to suspensions of 10 days or less, as well as to expulsions. Ordinarily, the Court held, a school should give a suspended student oral or written notice of the charge, an explanation of the evidence against the student if the student denies the charge, and an opportunity to present her version of events. *Goss*, 419 U.S. at 581. However, "[s]tudents whose presence poses a

> continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school." *Id.* at 582.

*Anderson v. Hillsborough Cnty. Sch. Bd.*, 808-CV-772-T-24TBM, 2009 WL 3669634 at \*6 (M.D. Fla. Oct. 30, 2009) *aff'd*, 390 F. App'x 902 (11th Cir. 2010). Further, the Eleventh Circuit has observed:

> The dictates of *Goss* are clear and extremely limited: Briefly stated, once school administrators tell a student what they heard or saw, ask why they heard or saw it, and allow a brief response, a student has received all the process that the Fourteenth Amendment demands. The only other requirement arises from the Court's admonishment that the hearing come before removal from school "as a general rule," unless a student's continued presence is dangerous or disruptive. In these instances, removal can be immediate.

*C.B. By & Through Breeding v. Driscoll*, 82 F.3d 383, 386 (11th Cir. 1996). The Due Process Clause creates a low standard for schools to meet—it is typically satisfied if the student is aware of why he or she is in trouble and given an opportunity to try to explain or dispute the alleged actions. *See Id.; see also Palmer ex rel. Palmer v. Santa Rosa Cnty., Fla., Sch. Bd.*, 3:05CV218/MCR, 2005 WL 3338724 at \*4-5 (N.D. Fla. Dec. 8, 2005) (discussing difference in standard between § 1983 claim and Title IX standard for sex based discrimination in school).

The Amended Complaint asserts that J.W. received at least three interactions with school officials that meet the *Goss* standard. On February 21, 2012 he was questioned and provided an opportunity to give his account. (Doc. 22 ¶¶ 88-90). Further, there were two expulsion hearings, one conducted on March 1, 2012 and another on March 13, 2012. (*Id.* ¶¶ 91-105, 109-17). Thus he was accorded the procedures due from the school. *See C.B. By & Through Breeding*, 82 F.3d at 386.

The Plaintiffs' responses to the various motions to dismiss assert that J.W. was not informed of the details of the allegations until after the initial interview. However, this did not deprive him of due process as he was plainly made aware of the interaction that was at issue and he had multiple opportunities to state his account of what happened. Accordingly, due process was not offended by

the specific timing of when the school explained M.R.'s allegations in detail. *Goss*, 419 U.S. at 578 (due process does not contemplate inflexible procedures applicable to every imaginable situation.).

### ii. Cross-Examination

As to the issue of cross-examination, the Wolskis requested the chance to question M.R. (Doc. 22 ¶ 100) and the responsive pleading make clear that they wanted to cross-examine her at the expulsion hearings (*see, e.g.,* Doc. 75 at 9-10). The Wolskis recognize that the right to cross-examine a witness in a school discipline context exists in only the most serious of cases and are highly contingent upon the circumstances of each case. (*See* Doc. 54 at 10 (citing *Flaim v. Medical College of Ohio*, 418 F.3d 629, 636 (6th Cir. 2005) (parenthetically noting "[s]ome circumstances may require the opportunity to cross-examine witnesses, though this right might exist only in the most serious of cases")). In this instance, the fact that contact between J.W. and M.R. had occurred was not contested. Rather, the contested issue was whether J.W. touched her breasts and buttocks and if so whether it was intentional. Plaintiffs assert that M.R. was lying about the events, and that a chance to cross-examine her may have led her to admit the lie or reveal other relevant information about her credibility.

When a disciplinary matter comes down to nothing more than a matter of credibility, cross-examination may be crucial for a fair hearing.[6] *See Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 641 (6th Cir. 2005) (noting that cross-examination is crucial in cases where the essential facts can only be determined by believing an accuser or an accused). At this early stage of the case, it is not clear whether cross-examination of M.R. was required to preserve basic fairness to J.W. *See Nash v.*

---

[6] J.W.'s written account, which appears to indicate he admitted to improper contact, was allegedly tainted by school officials who required him to rewrite it utilizing incriminating terminology. (Doc. 22 ¶¶ 67, 73). Accordingly, when read in the light most favorable to the Plaintiffs, that account may be of questionable value.

*Auburn Univ.*, 812 F.2d 655, 664 (11th Cir. 1987) ("Where basic fairness is preserved, we have not required the cross-examination of witnesses and a full adversary proceeding.").

As the Amended Complaint stands, however, it does not allege that the OCSB has an official policy of not permitting cross-examination of accusers, nor does it allege that there is a custom or practice of not permitting cross-examination of an accuser by a final policy maker for OCSB. *See Perez v. Sch. Bd. of Miami-Dade County*, 917 F. Supp. 2d 1261, 1264 (S.D. Fla. 2013) (*citing Grech v. Clayton County*, 335 F.3d 1326, 1329 (11th Cir. 2003)) (noting § 1983 liability can only be predicated on official policy or unofficial policy repeatedly acted upon by a final policy maker). Accordingly, the Plaintiffs have leave to amend their pleadings to assert a policy of precluding cross-examination of an accuser, if there is a good faith basis to do so.

While Plaintiffs may be able to assert a § 1983 claim against the OCSB regarding cross-examination, the individual defendants did not violate a clearly established constitutional right. In this case, the only constitutional violation that might have occurred was J.W. being prevented from cross-examining M.R. As the cases cited by the Plaintiffs demonstrate, cross-examination in the context of school discipline is a murky area of constitutional law. While J.W. may have had a right to cross-examine M.R., depending on the facts, it was not a right that was clearly established. *See Pearson v. Callahan*, 555 U.S. 223, 237 (2009) ("There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."). Accordingly, Defendants Adams, Smart, Sawyer, Forbes, Cowans, and Roland are entitled to qualified immunity and the § 1983 claims against them will be dismissed with prejudice.

### b. Intentional Infliction of Emotional Distress

The Plaintiffs also assert a claim for intentional infliction of emotional distress ("IIED") against Defendants Adams, Smart, Sawyer, and Cowans[7] (the "IIED Defendants") on behalf of J.W. The basic claim is that the IIED Defendants handled the inquiry into the allegations against J.W. in such a way that it shocks the conscious. To wit, they allegedly ignored information that brought M.R.'s credibility into doubt, ignored J.W.'s character and history of good behavior, and had J.W. change the wording of his statement[8] to utilize incriminating terminology.

To state a claim for IIED, "a plaintiff must show that: 1) the wrongdoer's conduct was intentional or reckless; 2) the conduct was outrageous; 3) the conduct caused emotional distress; and 4) the emotional distress was severe." *De La Campa v. Grifols Am., Inc.*, 819 So. 2d 940, 943 (Fla. Dist. Ct. App. 2002). Further, "[w]hat constitutes outrageous conduct is a question for the trial court to determine as a matter of law." *Id.* Florida sets out a very high threshold to properly assert a claim for IIED, even false accusations are insufficient. *Williams v. Worldwide Flight SVCS., Inc.*, 877 So. 2d 869, 870 (Fla. Dist. Ct. App. 2004) (noting that "[l]iability, however, does not extend to mere insults, indignities, threats, or false accusations" in case where Plaintiff complained of falsifying workplace discipline infractions based on racial animus).

---

[7] The IIED claims are contained in Counts IX-XII. (Doc. 22). Additionally, the Amended Complaint named M.R.'s parents as defendants in this case and asserted a claim of IIED against M.R. through them in Count VIII as well as a claim for defamation in Count XIII. However, pursuant to (Doc. 60) Kevin and Belinda Ream were dismissed from this lawsuit.

[8] The general allegations assert that Adams and Sawyer had J.W. change his account to include incriminating terminology. (Doc. 22 ¶¶ 67, 73). However, the IIED claims assert that it was Adams and Smart, not Sawyer, who forced J.W. to change his terminology. (*Id.* ¶¶ 341, 358). It appears that one of these is a typographical error. However, because the allegations fail to state a claim for IIED, which instance is in error is of no consequence.

According to the Amended Complaint there were no witnesses to the underlying contact between J.W. and M.R. The IIED Defendants were, therefore, required to make a determination as to what happened on the bases of the reports from J.W. and M.R. According to the Amended Complaint they did such a poor job that it shocks the conscious. However, such decisions are a function of the time, circumstance, and the background of the individuals involved in a purported breach of school rules. It is precisely the duty of school administrators to listen the accounts of potential school infractions and make a determination about what occurred. This may include discounting exculpatory and character evidence that tends to dispute an alleged school infraction. Even if the IIED Defendants made the wrong decision to discount such information and had less than desirable methodological approaches to such decision making, the type of behavior contained in the Amended Complaint is not the type of behavior that can be categorized as going beyond all bounds of decency. *See Ponton v. Scarfone*, 468 So. 2d 1009, 1011 (Fla. Dist. Ct. App. 1985) (stating that to state a claim for IIED, the alleged act must be intolerable in civilized society).

The most troubling allegations assert that certain school officials directed J.W. to change his statement to include incriminating terminology. First, J.W. was provided the opportunity to give his own account of the events during the initial questioning—prior to drafting his written statements. Second, at the hearings where the written statements were purportedly relied upon, J.W. was afforded the opportunity to verbally clarify his positions in his own words—this occurred in the presence of his family members who could provide moral support and encouragement to make his position clear. Third, J.W. had not one, but two formal hearings to clarify his position. While the allegations viewed in the light most favorable to the Plaintiffs are troubling, as school administrators are certainly in a position of power and influence with regard to students, they do not rise to the high standard set out under Florida law to assert a claim for IIED. *See Baskin v. McGregor Baptist*

*Church, Inc.*, 2:07-CV-710-FTM-29DN, 2008 WL 1930622 at *2 (M.D. Fla. Apr. 30, 2008) (dismissing count of IIED where it was alleged African American minor children were suspended/expelled based on false/exaggerated information where white children were not disciplined).

It is, therefore,

**ORDERED**, that the Motions to Dismiss (Docs. 36, 52, 55, 56, 57, 67, and 80) are **GRANTED.** The § 1983 claims against Defendants Adams, Smart, Sawyer, Forbes, Cowans, and Roland are dismissed **WITH PREJUDICE**. The remaining claims are dismissed **WITHOUT PREJUDICE** and the Plaintiffs shall have leave to file a Second Amended Complaint no later than June 30, 2014.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on June 11, 2014.

_____
GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party